**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **SHIELD INDUSTRIAL COATINGS, LLC,** | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| | § | |
| **V.** | § | |
| | § | |
| **SHIELD LINERS, LLC, COLTON W.** | § | **CIVIL CASE NO. 4:24-CV-01753-AHB** |
| **FULTZ, and JESSICA FULTZ,** | § | |
| *Defendants/Counter-Plaintiffs/Cross-* | § | **(JURY DEMANDED)** |
| *Plaintiffs,* | § | |
| | § | |
| **V.** | § | |
| | § | |
| **MICHAEL WITT and KRAIG** | § | |
| **KILLOUGH,** | § | |
| *Third-Party Defendants/Cross-* | § | |
| *Defendants.* | § | |

---

**DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO (D.I. 41)
SHIELD INDUSTRIAL COATINGS, LLC'S MOTION FOR SUMMARY JUDGMENT**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **COME NOW**, Defendants/Counter-Plaintiffs, Shield Liners, LLC ("**Shield Liners**"),

Colton W. Fultz ("**C.Fultz**"), and Jessica Fultz's ("**J.Fultz**") (collectively, "**Defendants**"), in the

above-styled and numbered cause, and respectfully file this Defendants/Counter-Plaintiffs'

Response to Shield Industrial Coatings, LLC's Motion for Summary Judgment (D.I. 41; the

"**Motion**"), respectfully requesting this Honorable Court to deny the Motion, including for those

reasons set forth hereinbelow, and, in support thereof, would respectfully show unto this

Honorable Court as follows:

P a g e **i** | **iv**

[DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO (D.I. 41) SHIELD INDUSTRIAL COATING, LLC'S MOTION FOR SUMMARY JUDGMENT]    Case No.: 4:24-CV-01753-AHB

# TABLE OF CONTENTS

Table of Contents ............................................................................................................... ii

Table of Authorities ......................................................................................................... iii

I.      Response to Plaintiff's Objections to Defendants' Presentation of Testimony ..................... 1

II.     Facts in Response to Plaintiff's "Undisputed" Material Facts ........................................ 3

III.    Issues Presented ..................................................................................... 13

IV.     Summary Judgment Standard ................................................................. 13

V.      Argument and Authorities ...................................................................... 17

   A.   Declaratory Judgment ........................................................................ 17

      1.   Defendants have more than a scintilla of evidence of the membership interest of Defendant C.Fultz. .......................................................................... 17

   B.   Quantum Merit ................................................................................... 18

      1.   Defendants have more than a scintilla of evidence that Defendants C.Fultz and J.Fultz provided valuable services to Plaintiff. ................................... 18

      2.   Defendants have more than a scintilla of evidence that Plaintiff accepted the services provided for its benefit. ........................................................ 18

      3.   Defendants have more than a scintilla of evidence that Defendants C.Fultz and J.Fultz notified Plaintiff they expected payment for their services. .............. 19

      4.   Defendants have more than a scintilla of evidence regarding the amount of damages owed to Defendants C.Fultz and J.Fultz for their services. ............... 19

VI.     Conclusion and Prayer for Relief ........................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Eeds,*
 392 F.3d 138 (5th Cir. 2004) ................................................................ 16

*Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,*
 343 F.3d 401 (5th Cir. 2003) ................................................................ 16

*Am. Trigger Pullers LLC v. Wylde,*
 No. CV H-19-2694, 2020 WL 1809724 (S.D. Tex. Apr. 9, 2020) ................................... 15, 16

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ................................ 14, 15, 17

*Armstrong v. Am. Home Shield Corp.,*
 333 F.3d 566 (5th Cir. 2003) ................................................................ 16

*Axxiom Mfg., Inc. v. McCoy Invs., Inc.,*
 846 F. Supp. 2d 732 (S.D. Tex. 2012) ................................................................ 15

*Baranowski v. Hart,*
 486 F.3d 112 (5th Cir. 2007) ................................................................ 15

*Bazan ex rel. Bazan v. Hidalgo County,*
 246 F.3d 481 (5th Cir. 2001) ................................................................ 14

*Boudreaux v. Swift Transp. Co., Inc.,*
 402 F.3d 536 (5th Cir. 2005) ................................................................ 16, 17

*Byers v. Dall. Morning News, Inc.,*
 209 F.3d 419 (5th Cir. 2000) ................................................................ 14

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ................................................................ 13, 14, 15

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,*
 530 F.3d 395 (5th Cir. 2008) ................................................................ 15

*Domain Prot., L.L.C. v. Sea Wasp, L.L.C.,*
 23 F.4th 529 (5th Cir. 2022) ................................................................ 14

*Domain Prot., LLC v. Sea Wasp, LLC,*
 426 F. Supp. 3d 355 (E.D. Tex. 2019), *aff'd sub nom. Domain Prot., L.L.C. v. Sea Wasp, L.L.C.,* 23 F.4th 529 (5th Cir. 2022) ................................................................ 14

*First National Bank of Arizona v. Cities Service Company,*
 391 U.S. 253, 288–289 (1968) ................................................................ 15

*Fontenot v. Upjohn Co.,*
 780 F.2d 1190, 1194 (5th Cir. 1986) ................................................................ 14

*Forsyth v. Barr,*
 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195 (1994) ........... 15

*Forsyth v. Barr,*
 513 U.S. 871, 115 S.Ct. 195 (1994) ................................................................ 15

*Great West Casualty Co. v. Flandrich,*
 605 F.Supp.2d 955 (S.D. Ohio 2009) ................................................................ 3

*Jacobs v. Tricam Industries, Inc.,*
 816 F.Supp.2d 487 (E.D. Mich. 2011) ................................................................ 3

*Kipp Flores Architects, LLC v. Pradera SFR, LLC,*
 No. SA-21-CV-00673-XR, 2023 WL 28723 (W.D. Tex. Jan. 2, 2023) ................................... 16

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (*en banc*) .......................................................... 15, 16
*Littlefield v. Forney Indep. Sch. Dist.*,
    268 F.3d 275 (5th Cir. 2001) ........................................................................... 15
*Malacara v. Garber*,
    353 F.3d 393 (5th Cir. 2003) ........................................................................... 16
*Martinez v. Schlumberger, Ltd.*,
    338 F.3d 407 (5th Cir. 2003) ........................................................................... 14
*Matsushita Electric Industrial Company v. Zenith Radio Corporation*,
    475 U.S. 574 (1986)........................................................................................ 15
*Morris v. Covan World Wide Moving, Inc.*,
    144 F.3d 377 (5th Cir. 1998) ...................................................................... 16, 17
*Ragas v. Tenn. Gas Pipeline Co.*,
    136 F.3d 455 (5th Cir. 1988) ........................................................................... 13
*Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*,
    336 F.3d 410 (5th Cir. 2003) ........................................................................... 16
*Septimus v. Univ. of Houston*,
    399 F.3d 601, 609 (5th Cir. 2005) ................................................................... 17
*Sossamon v. Lone Star State of Texas*,
    560 F.3d 316 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277, 131 S.Ct.
    1651, 179 L.Ed.2d 700 (2011) ......................................................................... 14
*Sossamon v. Texas*,
    563 U.S. 277, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011) .......................................... 14
*Stokes v. Carcavba, LLC*,
    No. EP-22-CV-00271-ATB, 2024 WL 1023068 (W.D. Tex. Mar. 8, 2024)........................... 15
*Stults v. Conoco, Inc.*,
    76 F.3d 651 (5th Cir. 1996) ............................................................................. 15
*Tubacex, Inc. v. M/V Risan*,
    45 F.3d 951 (5th Cir. 1995) ............................................................................. 15
*Venture Express, Inc. v. Vanguard National Trailer Corp.*,
    585 F.Supp.3d 1060 (M.D. Ten. 2022)................................................................ 3
*Wallace v. Tex. Tech Univ.*,
    80 F.3d 1042 (5th Cir. 1996) ........................................................................... 16
*Wiley v. State Farm Fire and Cas. Co.*,
    585 F.3d 206 (5th Cir. 2009) ........................................................................... 14

**Statutes**

TEXAS CIVIL PRACTICE AND REMEDIES CODE § 134.005............................................... 12
TEXAS PENAL CODE § 31.01 ............................................................................... 12
TEXAS PENAL CODE § 31.03 ........................................................................... 11, 12
TEXAS PENAL CODE § 31.05 ............................................................................... 12
TEXAS THEFT LIABILITY ACT, TEXAS CIVIL PRACTICE AND REMEDIES CODE, Chapter 134 ... 7, 11,
    13

**Rules**

FEDERAL RULES OF CIVIL PROCEDURE 56......................................................... 7, 8, 9, 10

## I.  RESPONSE TO PLAINTIFF'S OBJECTIONS TO DEFENDANTS' PRESENTATION OF TESTIMONY

1.    Contrary to Plaintiff's allegations that the fault lay with Defendants for Plaintiff's inability to depose Defendants C.Fultz and J.Fultz, the actual facts indicate otherwise.

2.    On May 9, 2024, Plaintiff filed its Original Complaint against Defendants. D.I. 1. On June 7, 2024, Defendants filed their Answer and Counterclaims. D.I. 7.

3.    On October 25, 2024, this Court entered the Scheduling Order in this matter, which included a deadline of June 23, 2025 to conduct discovery. D.I. 28.

4.    In February of 2025, Plaintiff's counsel asked Defendants' counsel if the depositions of Defendants could be scheduled for mid to late March. **Exhibit 1**, L.Mousilli Declaration at 2, ¶ 3.

5.    On March 24, 2025, Defendants' counsel responded that Defendants were available for depositions on April 11, 14, 17, and 18. *Id*. at 2, ¶ 4. Plaintiff's counsel also requested dates for a corporate representative, but had not yet provided topics at that time. *Id*.

6.    On April 1, 2025, Plaintiff's counsel noticed the depositions of Defendant J.Fultz for April 11, 2025 at 10:00 a.m. and Defendant C.Fultz for April 11, 2025 at 2:00 p.m. *Id*. at 2, ¶ 5. On April 3, 2025, Plaintiff's counsel sought to move the depositions to the following Friday, April 18, 2025, but Defendants' counsel indicated that the new date would not work. *Id*. Then, just three days before the scheduled depositions, Plaintiffs' counsel unilaterally canceled them due to family issues, requesting dates in the next few weeks. *Id*.

7.    Since that time, Plaintiffs' counsel made no meaningful effort to reset the depositions until a month before the close of discovery, when, on May 27, 2025, Plaintiff's counsel reached out requesting to depose Defendants during the week of either June 16 or 23. *Id*. at 2, ¶ 6. On June 9, 2025, Defendants' counsel responded that Defendant J.Fultz was available either of June 17 or 18 and Defendant C.Fultz was available on June 20. *Id*.

8.    On June 10, 2025, Plaintiff's counsel confirmed June 18 for Defendant J.Fultz and June

20 for Defendant C.Fultz. *Id*. at 2, ¶ 7. However, that morning, prior to Plaintiff's counsel's email, Defendant J.Fultz indicated she was no longer available June 18 and Defendants' counsel informed Plaintiff's counsel and reiterated that Defendant C.Fultz remained unavailable June 16–20 due to work obligations. *Id*. Having not received any confirmation of dates nor any notices of deposition, on June 14, 2025, Defendants' counsel noted that she was no longer available on June 17 or June 20 due to scheduled hearings in other matters. *Id*. at 3, ¶ 7.

9.    On June 16, 2025, Plaintiff's counsel requested dates past the discovery deadline, seeking to depose Defendants the weeks of July 7 and 14, with the possibility of the weeks of July 21 and 28 pending the resolution of a case that was currently set for a trial setting those two weeks. *Id*. at 3, ¶ 8. On June 25, 2025, Defendants' counsel responded that discovery was now closed and, Plaintiff's counsel's unilateral cancellation of the depositions in April and failure to promptly reschedule is not sufficient justification to force Defendants to appear for a deposition after the deadline. *Id*.

10.   Contrary to Plaintiff's allegations, this is not a case where Defendants have evaded discovery. *Id*. at 3, ¶ 9. Rather, Defendants, and their counsel, have remained cooperative and responsive throughout the process. *Id*. Plaintiff's counsel, on the other hand, unilaterally canceled the original depositions at the last minute and then simply allowed weeks to pass without rescheduling, only to attempt to rush in the final days of discovery to set depositions on dates already identified as unavailable. *Id*. This is further shown in Plaintiff's additional failure to properly move for this Court to consider compelling Defendants to appear, including by failing to comply with this Court's Rules. *Id*.; *see* D.I. 36-38.

11.   This is not the fault of Defendants, and Defendants should not be punished – as Plaintiff unreasonably requests – for Plaintiff's failures. **Ex. 1** at 3, ¶ 10. This is especially true where Plaintiff had ample opportunity to complete these depositions earlier and simply chose not to do

so. *Id*. This was the case with Plaintiff's delays regarding all discovery in this case. *Id*.

12.  Under FEDERAL RULE OF CIVIL PROCEDURE 30(b)(1), the party seeking to depose a witness bears the responsibility of issuing a deposition notice, and, if the parties cannot agree, the party must comply with this Court's Rules regarding discovery disputes. *See* Court Procedures and Practices of the Honorable Alfred H. Bennett, at 5, ¶ B(4). Moreover, the law is exactly the opposite of Plaintiff's unsupported argument lacking any legal or factual basis – not only do the rules not outright prevent Defendants from providing any testimony despite Plaintiff's failure to depose them, the rules do provide for the use of affidavits which fill gaps left open in discovery unless that testimony contradicts prior testimony. *See Jacobs v. Tricam Industries, Inc.*, 816 F.Supp.2d 487, 492-493 (E.D. Mich. 2011); *Venture Express, Inc. v. Vanguard National Trailer Corp.*, 585 F.Supp.3d 1060, 1071 (M.D. Ten. 2022); *Great West Casualty Co. v. Flandrich*, 605 F.Supp.2d 955, 970-971 (S.D. Ohio 2009).

13.  Plaintiffs had every opportunity to conduct these depositions in a timely and fair manner and failed to do so. The prejudice to Defendants and their counsel from being forced to attend improperly scheduled depositions so close to, or after, the discovery deadline outweighs any interest Plaintiff may assert at this stage. Thus, Plaintiff's objections should be overruled.

## II.  FACTS IN RESPONSE TO PLAINTIFF'S "UNDISPUTED" MATERIAL FACTS

14. In mid-to-late 2021, after becoming friends with two other individuals in the neighborhood, Third-Party Defendants/Cross-Defendants, Michael Witt ("**Witt**") and Kraig Killough ("**Killough**") (collectively, "**Third-Party Defendants**"), Defendant C.Fultz decided to go into business with them, and Defendant C.Fultz asked for the assistance of these two new friends. **Exhibit 2** at 2, ¶ 3; **Exhibit 3** at 2, ¶ 3. This new business was to be Shield Industrial Coatings, LLC, and the company was officially formed and filed as a Texas LLC in August of 2021. *Id*. The company was to be operated for at least the purposes of manufacturing and supplying

a polyurea chemical solution to customers (primarily in the oil and gas, automotive, and construction industries) for use as a durable, quick-acting protective coating. *Id*. Among its various applications, this polyurea solution can be applied to products and equipment (such as chemical tanks and containment basins, automobile liners and trailers, and indoor and outdoor flooring) to protect against corrosion, abrasions, and slips-and-falls. *Id*.

15. As part of the discussions with Third-Party Defendants, Defendant C.Fultz and Third-Party Defendants decided to form the entity with equal shares of the company, with Third-Party Defendant Witt, Third-Party Defendant Killough, and Defendant C.Fultz. **Ex. 2** at 3, ¶ 4. As part of the agreement, after several months of discussion and planning, Defendant C.Fultz was chosen to act as the operator of the company who would run the operations of Plaintiff as an equal one-third owner of the company, Third-Party Defendant Witt would act as the managing member of Plaintiff as an equal one-third owner of the company, and Third-Party Defendant Killough would primarily serve as the financial backer of the company as an equal one-third owner of the company. *Id*.

16. Despite the equal one-third ownership of each party, the parties agreed that Defendant C.Fultz would be the only owner to earn a salary, at an agreed-upon rate of $90,000. **Ex. 2** at 2-3, ¶ 5. This amount was based on the salary Defendant C.Fultz had at his position at Marvel Industrial Coatings prior to forming Plaintiff of approximately $130,000, as set forth in the pay stubs that Defendant C.Fultz showed to Third-Party Defendant Killough during the discussions. *Id*. The $130,000 yearly earning actually represented one of Defendant C.Fultz's lowest years, as it was during the onset of COVID in 2020. *Id*. Thus, not only did the agreed-upon $90,000 salary represent a reduction in the pay Defendant C.Fultz was currently receiving at the time, but it was still a $40,000 reduction from Defendant C.Fultz's lowest amount earned. Defendant C.Fultz's expectation was that his share of the profits from this new venture would compensate for this

temporary reduction. *Id*.

17.   Shortly after leaving his prior job in February 2021 to fully commit to Plaintiff, Defendant C.Fultz's wife, Defendant J.Fultz, began assisting him in running the company, including working full-time in marketing and secretarial roles for Plaintiff, without compensation. **Ex. 2** at 3, ¶ 6; **Ex. 3** at 2, ¶ 4. In addition to their sweat-equity, Defendants C.Fultz and J.Fultz invested personal funds into setting up the office for Plaintiff and purchasing some of the necessary equipment. *Id*. At the beginning, the office and work location for Plaintiff so that the company initially operated from an office space shared with Third-Party Defendant Witt's other company, ARW Off-Road. *Id*.

18.   In March of 2021, Defendant J.Fultz began assisting Defendant C.Fultz and worked full-time in marketing and secretarial roles for Plaintiff, without compensation. **Ex. 2** at 3, ¶ 7; **Ex. 3** at 2, ¶ 5. Both invested personal funds into setting up the office and purchasing necessary equipment. *Id*. Throughout 2021, both Defendant C.Fultz and J.Fultz worked tirelessly to grow the business, with Defendant J.Fultz taking on a nursing contract again in August of 2021 to alleviate financial strain while still supporting Shield Industrial. *Id*. Unfortunately, Defendant C.Fultz was never actually paid his full salary. *Id*.; *see* **Exhibit A**; **Exhibit B**.

19.   As part of Defendant J.Fultz's role and responsibilities at the company, she created documents for the company, including, but not limited to, a leads sheet, vendors log, sponsorship contract, and similar documents. Ex. 3 at 3, ¶ 6. She also created marketing material for the company, created all social media accounts and related content, including photography, content creation, flyers, logo design, graphic design, merch designs, and merch printing. *Id*. She also helped with administrative duties, such as email responses, creating invoices, reaching out for payments, creating a Google drive for all documents created for the business, and cleaning. *Id*. She also assisted in sales by making sales calls, setting up sales meetings, and doing drop-in visits at

local businesses. *Id*. She also provided physical labor alongside her husband, Defendant C.Fultz, to help set up the bedliner booth at Third-Party Defendant Killough's dealership, and she helped her husband prep to spray bedliners and spent many long hours in the shop helping him spray or repair machines. *Id*. She also assisted with logistics, setting up freight, and even helped Defendant C.Fultz physically unload a truckload of pallets of chemical drums along with other physical labor as needed. *Id*.

20.  Based on her experience in the industry, and research of positions, the median annual salary for a marketing manager is approximately $161,030 as of May 2024, according to the Bureau of Labor Statistics (BLS). *Id*. at 3, ¶ 7. Defendant J.Fultz spent approximately sixty percent (40%) of her time while working at the company performing these tasks, meaning during her full tenure between approximately March of 2021 through August of 2023, she would be entitled to an amount of $155,662.33 for this role. *Id*.

21.  Based on her experience in the industry, and research of positions, the average rate for a bedliner technician is $25 per hour. *Id*. at 3, ¶ 8. This means, at a minimum, with an average spray time of two to three (2-3) hours, but excluding travel time, which could vary depending on locations and traffic, she spent approximately 120 hours acting in this role, resulting in a total of $3,000 of unpaid wages. *Id*.

22.  Based on her experience in the industry, and research of positions, the average salary for an executive assistant varies significantly, but generally falls between $63,000 and $65,000 per year in the United States, with Texas averaging around $64,000. *Id*. at 3-4, ¶ 9. Defendant J.Fultz spent approximately sixty percent (60%) of her time while working at the company performing these tasks, meaning during her full tenure between approximately March of 2021 through August of 2023, Defendant J.Fultz would be entitled to an amount of $92,800 for this role. *Id*.

23.  Defendant J.Fultz's duties at the company also included the creation of the website, with

the domain and website created by Ten Peaks Media based on information and designs provided by Defendants C.Fultz and J.Fultz. *Id*. at 4, ¶ 10. The domain was hosted on the registrar GoDaddy and managed by Ten Peaks Media under authority of Defendants C.Fultz and J.Fultz, not Third-Party Defendants. *Id*.

24. Further, Defendant J.Fultz helped Defendant C.Fultz set up a Google Drive for the company, with Defendant C.Fultz as the owner of the documents on the drive. *Id*. at 4, ¶ 11. This meant that Defendant J.Fultz was in charge of those documents, and Third-Party Defendants were required to request access if they wished to interact with any of these documents. *Id*.; **Exhibit G**.

25. During Defendant C.Fultz's tenure at Plaintiff, he was never an employee of Plaintiff, but, rather, was, at a minimum, a member and officer. **Ex. 2** at 3-4, ¶ 8. Throughout Defendant C.Fultz's tenure as an member-owner of Plaintiff, he was presented as an owner to outside parties by Third-Party Defendants, he was interacted with as an owner by both Third-Party Defendants and outside parties, he had access to sensitive documents and records as an owner, and he was assured repeatedly by each of Third-Party Defendants that he was an owner. *Id*. In fact, due to his experience in the field, and the lack of experience in the field of each of Third-Party Defendants, Defendant C.Fultz was tasked with doing everything necessary to actually run the business. *Id*. Third-Party Defendants, and, thus, Plaintiff, relied on Defendant C.Fultz almost entirely, and Third-Party Defendants were essentially only tasked with funding the company and managing the company. *Id*. Defendant C.Fultz was also held out as Chief Operations Officer for Plaintiff, and an officer in the company with significant operational authority. *Id*.; *see also id*. at 4-5, ¶¶ 9-14.

26. Among the many roles and responsibilities Defendant C.Fultz had at the company, he was the sole operate and Chief Operations Officer with a $90,000 agreed-upon salary. *Id*. at 4, ¶ 9. However, based on Defendant C.Fultz's knowledge of, and experience in, the industry, this was well-below the average salary in the industry, which ranges from $180,000 to over $440,000 per

year for the same position. *Id*.

27. Defendant C.Fultz also served as the lead technician and service technician for the company. *Id*. at 4, ¶ 10. Based on Defendant C.Fultz's knowledge of, and experience in, the industry, these services would be valued at a rate of $750 per day. *Id*. This was a job that Defendant C.Fultz performed at least fifty percent (50%) of the time he worked for the company during the period of approximately August 2020 to August 2023, resulting in approximate amount of around $292,500 if assuming a five (5) day work week during this period. *Id*. However, this is a minimum, as many weeks Defendant C.Fultz worked more than five (5) days and does not include any amounts for accommodations to which Defendant C.Fultz would have been entitled in this position. *Id*.

28. Defendant C.Fultz also served as the main salesperson for the company. *Id*. at 4-5, ¶ 11. Based on Defendant C.Fultz's knowledge of, and experience in, the industry, these services would be valued with a base commission on all sales of between ten to twenty percent (10-20%). *Id*. During Defendant C.Fultz's time at the company, there was an average minimum of $3,000 in sales per week, meaning Defendant C.Fultz would have been entitled to $300 per week, or in total, a minimum of $46,800 at the minimum ten percent (10%) rate. *Id*. In reality, this amount would be much higher, as sales were often higher than this minimum average. *Id*.

29. Defendant C.Fultz also served as the bedliner technician for the company. *Id*. at 5, ¶ 12. This included his traveling from locations like Alvin, Texas to Sprint, Texas weekly to spray bedliners for Third-Party Defendant Killough's dealership, but Defendant C.Fultz was never paid for these services. *Id*. Defendant C.Fultz also coated Third-Party Defendant Witt's RV roof without being paid. *Id*. Based on Defendant C.Fultz's knowledge of, and experience in, the industry, these services would be valued at $25 per hour with an average spray time of two to three (2-3) hours. *Id*. This means, at a minimum, excluding travel time, which could vary depending on

locations and traffic, Defendant C.Fultz spent approximately 320 hours acting in this role, resulting in a total of $8,000 of unpaid wages. *Id*.

30. Defendant C.Fultz also served as the manager of our freight and logistics. *Id*. at 5, ¶ 13. This included Defendant C.Fultz setting up freight for the company under Third-Party Defendant Witt's broker account, which would result in him earning ten percent (10%) of every shipment made for import and export. *Id*.

31. Defendant C.Fultz also served in an administrative role, including billing, creating invoices, taking payments, making payments, cutting checks, establishing new accounts, managing Quickbooks, and setting up the office, documents, filings, billing, logistics, and cleaning. *Id*. at 5, ¶ 14. Despite Defendant C.Fultz's low salary of $90,000 as an officer, this amount did not cover these responsibilities. *Id*. Based on Defendant C.Fultz's knowledge of, and experience in, the industry, the average office administrator would be paid a salary of $60,000 per year. *Id*.

32. Additionally, in order to confirm Defendant C.Fultz's member-owner position in the company, prior to leaving his prior job in early 2021, Defendant C.Fultz was shown a contract by Third-Party Defendant Witt setting forth Defendant C.Fultz's equal one-third interest on Third-Party Defendant Witt's computer. *Id*. at 5-6, ¶ 15. When Defendant C.Fultz asked if it was ready to be signed, Third-Party Defendant Witt noted that Third-Party Defendant Witt needed to make some additional redlines, but would send the updated version. *Id*. However, despite multiple requests for the updated version, Defendant C.Fultz never received any updated version. *Id*.

33. Even though Defendant C.Fultz never received any updated contract, on May 13, 2021, Third-Party Defendant Killough confirmed the ownership model of Plaintiff, including Defendant C.Fultz's equity interest and salaried nature with the company via group message between Defendant C.Fultz and each of Third-Party Defendants. *Id*. at 6, ¶ 16; **Exhibit C**. As set forth in

the messages, the model included immediate one-third ownership (now, inexplicably reduced to 30% without my approval) and an opportunity for additional immediate income due to Defendant C.Fultz's industry experience and sales. *Id*. This group text included Third-Party Defendant Witt, who confirmed the agreement. *Id*. Further, on the same day, after Third-Party Defendant made statements in a text message regarding commission-based pay that undermined Defendant C.Fultz's interest in the company, Defendant C.Fultz was prompted to reiterate that he was told otherwise and began questioning how his ownership interest was being treated. *Id*.; **Exhibit D**.

34.  Later in 2021, Defendant C.Fultz took charge in relocating the company to a new office within the same business center, and noticed that Third-Party Defendant Witt continued to allocate funds from Plaintiff to cover the rent for his unrelated business, ARW Off-Road, without the knowledge of Defendant C.Fultz or Third-Party Defendant Killough. *Id*. at 6, ¶ 17. I was only able to uncover this financial impropriety during a review of QuickBooks transactions for the company. *Id*.

35.  By mid-2022, financial pressure mounted as Defendant C.Fultz's payments from Plaintiff ceased and Defendant J.Fultz's nursing income became the household's sole support. *Id*. at 6, ¶ 18; **Ex. 3** at 4, ¶ 12. Despite these challenges, Defendants C.Fultz and J.Fultz continued to invest time and money into the business. *Id*. Moreover, during this time, Defendant C.Fultz started to become more aware of Third-Party Defendant Witt's impropriety and failure to do his job, including failing to properly file tax paperwork, which resulted in the forfeiture of the company in 2022. *Id*.

36.  In the spring of 2023, Third-Party Defendant Witt unfortunately suffered a severe traumatic brain injury because of an accidental workplace fall and, based on information and belief, was medically required to stay in the hospital for several weeks and was unable to return to the workplace for several months while he recuperated from his injuries. **Ex. 2** at 7, ¶ 19; **Ex. 3** at 4-

5, ¶ 13. During this lengthy recuperation period, as owner of Plaintiff, Defendant C.Fultz served as the sole de facto manager and officer for Plaintiff, as there was no other person to take this role. *Id*. Based on information and belief, Third-Party Defendant Witt was injured when he fell from his trailer at a Jeep event in Moab and returned home quickly. *Id*. Based on information and belief, despite this injury, he went on vacation with his family on June 20, 2023 and again on July 4, 2023 during his alleged 'recuperation' period. *Id*. This further cemented that Third-Party Defendant Witt simply disregarded any of his obligations to the company, including never coming to the office and never checking in. *Id*.

37.   During this time, Defendant C.Fultz contacted Third-Party Defendant Killough to inform him of these improprieties and concerns regarding the finances of the company. **Ex. 2** at 7, ¶ 20; **Ex. 3** at 5, ¶ 14. Specifically, Defendant C.Fultz noted that the costs for rent were becoming unmanageable and it would be a good idea if the company moved locations. *Id*. Third-Party Defendant appeared to not really care and just told Defendant C.Fultz to do what he needed to handle things. *Id*. By this point, it had been months since Defendant C.Fultz had last received his agreed-upon salary payment. *Id*. Defendant C.Fultz's payments were stopped by Third-Party Defendant Witt without any explanation or notice given until Defendant C.Fultz eventually confronted Third-Party Defendant Witt about the missed payments. *Id*. Despite this, Defendant C.Fultz continued to work alongside Defendant J.Fultz to increase profitability so the business they had worked so hard for could hopefully afford to continue making Defendant C.Fultz's salary payments and, if possible, make payments from profit shares. *Id*.

38.   Thus, in order to reduce costs, Defendants C.Fultz and J.Fultz began relocating the company property, purchased with funds the company made solely from the work Defendant C.Fultz performed, to a new location they had just purchased, where there would not be any rent to pay, thus reducing the company's overhead. **Ex. 2** at 7-8, ¶ 21; **Ex. 3** at 5, ¶ 15. During this time,

both Third-Party Defendants worked with Defendant C.Fultz to relocate the property. *Id*. It was Defendant C.Fultz's understanding, based on information and belief, that, although Plaintiff's property was able to be removed from the shared location, Third-Party Defendant Witt was unable to leave the lease because his brother had damaged the door and his other company was required to pay for it. *Id*.

39.  It was not until July 2023, when disagreements started to arise between Defendant C.Fultz and Third-Party Defendants over office space and operational support, that Third-Party Defendants ceased this amicable assistance. **Ex. 2** at 8, ¶ 22; **Ex. 3** at 5-6, ¶ 16. Despite being aware of the relocation, on July 25, 2023, Defendant C.Fultz exchanged text messages with Third-Party Defendants where they accused Defendant C.Fultz of stealing the property. *Id*.; **Exhibit E**. In response, Defendant C.Fultz indicated that they knew that there was no robbery, and that Defendant C.Fultz was "working on a set up that will help me get things done more efficiently" and that Defendant C.Fultz could better explain if they would simply talk to him in person. *See id*. During this time, Third-Party Defendant Killough texted Defendant C.Fultz regarding selling the entire company to him, and allowing him to keep the name and continue operations. *Id*.; **Exhibit F**.

40.  Although, at times, Third-Party Defendants would resurface to try and see if Defendants C.Fultz and J.Fultz were still spraying at Third-Party Defendant Killough's dealership in Alvin, Texas, and even try to send them business. **Ex. 2** at 8, ¶ 23; **Ex. 3** at 6, ¶ 17. Third-Party Defendant Witt even contacted Defendant C.Fultz to give condolences following the passing of his father. *Id*. Third-Party Defendant Killough continued to communicate with Defendant C.Fultz, attempting to sell the company to Defendant C.Fultz. *Id*.

41.  Only when Third-Party Defendant Killough began drafting a proposal with his attorney was it stated that Defendant C.Fultz, in fact, was never given any legal ownership in the company.

**Ex. 2** at 8-9, ¶ 24; **Ex. 3** at 6, ¶ 18. At that point, Defendants C.Fultz and J.Fultz stopped communicating with Third-Party Defendants, and there were no real efforts by them to obtain any of the equipment they now allege belongs to them. *Id*. Rather, at that point, most of the equipment and office supplies were already fully within the possession of Defendants C.Fultz and J.Fultz, who were continuing to operate the company. *Id*.

42.   Rather than work with Defendant C.Fultz, Plaintiff and Third-Party Defendants decided to file suit against Defendants. **Ex. 2** at 9, ¶ 25; **Ex. 3** at 6, ¶ 19. Notably, due to the fact that the company ran almost entirely off of Defendant C.Fultz's and Defendant J.Fultz's work, and Third-Party Defendant Witt failed to act in the interest of the company, the company failed soon after Defendant C.Fultz was forced to leave in late 2023. *Id*. In fact, as of today, without the services of Defendants C.Fultz and J.Fultz, the company no longer exists. *Id*. In fact, the company has, again, been forfeited for failure to properly file tax documents. *Id*.

### III.  ISSUES PRESENTED

43.   Whether Plaintiff/Counter-Defendant, Shield Industrial Coatings, LLC ("**Plaintiff**"), has met its burden on summary judgment to show that, when all of the competent summary judgment evidence, and all reasonable inferences therefrom, are viewed in the light most favorable to Defendants, Plaintiff has proven that Defendants have failed to provide a scintilla of evidence on each and every element of their claims for Declaratory Judgment and quantum merit and that no genuine issue of material fact remains for any such element.

### IV.  SUMMARY JUDGMENT STANDARD

44.   FEDERAL RULE OF CIVIL PROCEDURE 56 authorizes summary judgment where a party "shows that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1988). "A fact is material

P a g e  **13 | 21**

[DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO (D.I. 41) SHIELD INDUSTRIAL COATING, LLC'S MOTION FOR SUMMARY JUDGMENT]    Case No.: 4:24-CV-01753-AHB

only if its resolution would affect the outcome of the action" under the governing substantive law and "an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011) (citation omitted).

45.   The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 324; *see also Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate if the movant shows "a fact cannot be or is genuinely disputed" based on "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Specifically, "[i]f the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes 'beyond peradventure all of the essential elements of the claim or defense.'" *Domain Prot., LLC v. Sea Wasp, LLC*, 426 F. Supp. 3d 355, 369 (E.D. Tex. 2019), *aff'd sub nom. Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022) (*quoting Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). "Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case." *Domain Prot.*, 426 F.Supp. 3d at 369 (*citing Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000)). Thus, "[t]he moving party bears the initial burden of establishing that no genuine fact dispute exists, either by pointing

P a g e **14 | 21**

to evidence so establishing, or by pointing out a lack of evidence to support the nonmovant's case." *Stokes v. Carcavba, LLC*, No. EP-22-CV-00271-ATB, 2024 WL 1023068, *2 (W.D. Tex. Mar. 8, 2024) (*citing* FED. R. CIV. P. 56(c)(1)(A)–(B); *Celotex*, 477 U.S. at 324–325).

46.  Only if the movant meets this burden does the burden then shift to the nonmovant to "designate specific facts showing that there is a genuine issue for trial" beyond mere reliance on the allegations or denials in the nonmovant's pleadings. *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (*citing Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence'" supports resolution of the material factual issues in its favor. *Stults*, 76 F.3d at 656 (*quoting Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195 (1994)); *Anderson*, 477 U.S. at 248–250 (*citing First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288–289 (1968)); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846 F. Supp. 2d 732, 742 (S.D. Tex. 2012) (*citing Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007)); *Diamond Offshore Co. v. A & B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). To demonstrate a genuine issue as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" by proffering improbable assertions, hearsay, conclusory allegations, unsubstantiated assertions, or unsupported speculation, which are not competent summary judgment evidence, or by only a scintilla of evidence. *Matsushita Electric Industrial Company v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986); *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008); *Am. Trigger Pullers LLC v. Wylde*, No. CV H-19-2694, 2020 WL 1809724, *2 (S.D. Tex. Apr. 9, 2020) (internal citations omitted); *Stokes*, 2024 WL 1023068 at *2 (*citing Forsyth*, 19 F.3d at 1533); *Kipp Flores*

*Architects, LLC v. Pradera SFR, LLC*, No. SA-21-CV-00673-XR, 2023 WL 28723, *3 (W.D. Tex. Jan. 2, 2023); *Little*, 37 F.3d at 1075. Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential" element of each asserted claim. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (*quoting Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

47.    When determining whether the nonmovant has established a genuine issue of material fact, a reviewing court must view the evidence presented in the record in the light most favorable to the nonmoving party and make all reasonable inferences from such evidence in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1048 (5th Cir. 1996); *see McClain*, 2023 WL 361554 at *3 (*citing Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003); *quoting Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004)); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (*citing Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003); *Little*, 37 F.3d at 1075). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075. But, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…consider the fact undisputed for purposes of the motion." *Wylde*, 2020 WL 1809724 at *2 (*quoting* FED. R. CIV. P. 56(e)(2)). Nonetheless, a reviewing court may not "weigh the evidence or evaluate the credibility of witnesses" in making its ruling, nor does Rule 56 "impose upon the Court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment; evidence not referred to in the response to the motion for summary judgment is not properly before the Court, even if it exists in the summary judgment record." *McClain*, 2023 WL 361554 at *4 (*citing Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)); *Boudreaux*, 402

F.3d at 540 (*citing Morris*, 144 F.3d at 380). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (*quoting Anderson*, 477 U.S. at 251–252).

## V.  ARGUMENT AND AUTHORITIES

### A.  Declaratory Judgment

#### 1.  *Defendants have more than a scintilla of evidence of the membership interest of Defendant C.Fultz.*

48.  Here, there is no disputing that, at least until Third-Party Defendant Killough began drafting a proposal, Defendant C.Fultz was not only held out as an owner of the company, but, in fact, was an owner of the company. Indeed, the three parties jointly agreed to share profits, with Defendant C.Fultz contributing service capital by taking on almost the entirety of the obligations for operation of the company. The attempts by Third-Party Defendants to try and improperly oust Defendant C.Fultz are insufficient to destroy Defendant C.Fultz's clear ownership interest.

49.  Plaintiff's own Motion does not dispute that Defendant C.Fultz "partnered with Killough and Witt to have profit sharing" (Motion at 7-8), but, rather, takes issue only with the fact that Third-Party Defendants never gave Defendant C.Fultz a contract to sign. This improper behavior by Third-Party Defendants likewise does not destroy Defendant C.Fultz's otherwise properly created ownership interest, including in view of the totality of the circumstances, and Plaintiff's and Third-Party Defendants' own conduct.

50.  Moreover, the fact that Defendant C.Fultz ran nearly the entirety of the operations of the company, while Third-Party Defendants failed to even minimally perform their obligations further evidences the fact that Defendant C.Fultz, not Third-Party Defendants, was the true owners of Plaintiff.

51. Therefore, in view of the facts stated herein, Defendants possess more than a scintilla of evidence of Defendant C.Fultz's ownership in Plaintiff. Thus, Plaintiff has failed to prove no genuine issue of material fact exists regarding same. Plaintiff's Motion must be denied for this reason.

**B.  Quantum Merit**

*1.  Defendants have more than a scintilla of evidence that Defendants C.Fultz and J.Fultz provided valuable services to Plaintiff.*

52. Here, Defendants C.Fultz and J.Fultz clearly provided valuable services to Plaintiff. This includes essentially running the company without Third-Party Defendants at all. There can be no dispute that the numerous roles and responsibilities of each of Defendants C.Fultz and J.Fultz which resulted in the only reason Plaintiff was able to operate – even despite Third-Party Defendants' lack of performance causing Plaintiff to be forfeited.

53. Therefore, in view of the facts stated herein, Defendants possess more than a scintilla of evidence that Defendants C.Fultz and J.Fultz provided valuable services to Plaintiff. Thus, Plaintiff has failed to prove no genuine issue of material fact exists regarding same. Plaintiff's Motion must be denied for this reason.

*2.  Defendants have more than a scintilla of evidence that Plaintiff accepted the services provided for its benefit.*

54. Again, the fact that Plaintiff was able to operate as long as it did is a testament to the work of Defendants C.Fultz and J.Fultz, and nobody else. Without them, Plaintiff simply would not have existed. In fact, once Defendants C.Fultz and J.Fultz were improperly ousted, Plaintiff, indeed, did cease to exist.

55. Therefore, in view of the facts stated herein, Defendants possess more than a scintilla of evidence that Plaintiff accepted, for its benefit, the valuable services provided to it by Defendants C.Fultz and J.Fultz. Thus, Plaintiff has failed to prove no genuine issue of material fact exists

regarding same. Plaintiff's Motion must be denied for this reason.

### 3. Defendants have more than a scintilla of evidence that Defendants C.Fultz and J.Fultz notified Plaintiff they expected payment for their services.

56. As to Defendant C.Fultz, there is no dispute that he was owed a salary which was never fully realized. Instead, in each of 2021 and 2022, he received less than the agreed-upon salary.

57. Moreover, at multiple points, Defendants C.Fultz and J.Fultz indicated to Plaintiff, including through each of its owners, Defendant C.Fultz and Third-Party Defendants, that they sought payment for their services. This is clear from the numerous attempts at requesting said payment and from Defendant C.Fultz's and J.Fultz's notices that the amounts they were receiving were insufficient to support not only the business, i.e., Plaintiff itself, but the lives of Defendants C.Fultz and J.Fultz. Indeed, due to the lack of consistent payment, Defendant J.Fultz was forced to find a job as a nurse after previously having left to join Plaintiff.

58. Therefore, in view of the facts stated herein, Defendants possess more than a scintilla of evidence that Defendants C.Fultz and J.Fultz provided Plaintiff with notice that they expected compensation for their services. Thus, Plaintiff has failed to prove no genuine issue of material fact exists regarding same. Plaintiff's Motion must be denied for this reason.

### 4. Defendants have more than a scintilla of evidence regarding the amount of damages owed to Defendants C.Fultz and J.Fultz for their services.

59. As set forth herein, based on the experience of each of Defendants C.Fultz and J.Fultz, and the amounts of work each of Defendants C.Fultz and J.Fultz performed for Plaintiff, there are calculable amounts which are owed to them. These include those set forth in Exhibits 2 and 3.

60. Plaintiff's argument regarding Defendants' response to an interrogatory are not preclusive of the information provided by the testimony of Defendants C.Fultz and J.Fultz. Nor has Plaintiff provided any support for such preclusion because it cannot. Rather, Plaintiff provides nothing more than conclusory attorney argument, not legal or factual bases.

61.  Therefore, in view of the facts stated herein, Defendants possess more than a scintilla of evidence regarding the damages suffered by, and amounts to, Defendants C.Fultz and J.Fultz for their services. Thus, Plaintiff has failed to prove no genuine issue of material fact exists regarding same. Plaintiff's Motion must be denied for this reason.

## VI.  CONCLUSION AND PRAYER FOR RELIEF

NOW WHEREFORE, for at least those reasons stated in this response, Plaintiff has failed to meet its burden on summary judgment, and, thus, Defendants hereby respectfully request this Honorable Court deny Plaintiff's Motion in its entirety. Defendants pray for such other and further relief, whether general or special, at law or in equity, to which Defendants may be shown to be justly entitled.

DATED: August 28, 2025                              Respectfully submitted,

                                                   Mousilli Law, PLLC

                              BY:    */s/ Shea N. Palavan*
                                     Shea N. Palavan
                                         TX Bar No. 24083616
                                         SDTX Bar No. 1692329
                                     Lema Mousilli
                                         TX Bar No. 24056016
                                         SDTX Bar No. 1358290
                                     11807 Westheimer Road
                                     Suite 550, PMB 624
                                     Houston, Texas 77077
                                     Tel: (281) 305-9313
                                     service@mousillilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document, and any attachments, will be served to counsel of record, in accordance with the governing rules of procedure regarding service on this August 28, 2025, via electronic filing manager as follows:

Kevin Pennell
**PENNELL LAW FIRM PLLC**
24 Greenway Plaza, Suite 500
Houston, Texas 77046
Tel: (281) 813-8959
service@justwynnelaw.com

Attorney for Plaintiff, Shield Industrial Coatings, LLC
and
Third-Party Defendants / Cross-Defendants Michael Witt and Kraig Killough

P a g e  **21 | 21**

[DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO (D.I. 41) SHIELD INDUSTRIAL COATING, LLC'S MOTION FOR SUMMARY JUDGMENT]                    Case No.: 4:24-CV-01753-AHB